Mandala v. Jordan May it please the court, my client recognizes that this court is wary of turning ordinary contract disputes into RICO claims. But the unprecedented, never before seen, erroneous and unsubstantiated charges that are involved in this case are in furtherance of the scheme that's been alleged. It's not the scheme itself. Both Describe for us what your view is of, what is the enterprise here? The enterprise is essentially the group that is employed by or associated with, directly or indirectly, the sooner enterprise, which namely what they do is they go in and together they target and purchase, finance, and then control various properties. And then what they do is they overcharge tenants with regard to multiple different areas of the tenancy. Okay. Yeah. Yeah. You've given me a direct answer and I appreciate that. But be a little bit more specific. So you said the group. So just tell us what, what, what entities in your view make up this, this enterprise, enterprise being a term of art here? Yes. So they fall under three categories essentially. One is the Jordan-affiliated group, which the Jordan-affiliated group is Mr. Jordan himself. And then you have JP Banner, which owns the actual Banner Place Building. You have Sooner, which is essentially owned by Mr. Jordan and who actually effectuates a lot of these charges and, and for lack of a better term, bogus OPEX reports. And JP Realty, which runs and owns the entity. And lastly, you have the Banner Investors, which Banner Investors actually is the one that brings on and defrauds the investors. Now the second group is what I call the Jordan Supplicants. And the Jordan Supplicants are Mr. Florsheim and Ms. Hall and Ms. Maxa Jordan. And these are people that actually sent out the mail and wire frauds. How do you know they were, I mean, they were, if they were employees and I realized one of them ended up being married to Mr. Jordan, how do you, this is a kitchen sink list of defendants because you didn't plead who was really, you probably would have done better if you had pleaded two or three defendants rather than seven or eight. I appreciate that, Your Honor, and I appreciate the question. And the point is that this RICO scheme, as in many RICO schemes, is broad. And as you held in your Thompson decision, as Judge Smith held in his Plambeck decision, and as given by the U.S. Supreme Court in Reeves and Ms., and Judge Boyle in Bridgewater, this is a broad-based brush in terms of putting out a net capable of taking down the lowest rung, in the words of your opinion, Judge Smith, the lowest rung of the participants. The text of the statute itself says, employed by or associated with . . . Your client, the law firm, went in as an investor with Jordan, right? They went in first as a tenant and then also later on, they became one of the investors. At about, at the same time that Jordan's group purchased the property, right? They were in a, were they an investor in Banner or just an investor in the property itself? After Mr. Jordan and the Sooner Enterprise took over the building, my firm became an investor. Right. And that's before . . . And then you got bought out, right? And then we got bought out, but we got bought . . . But you don't have any claim that you were bought out under fraud or too low a price or anything like that, right? We're not asserting our claims as an investor. Okay. But that is not the actual standard of relatedness under the continuity prong or how it works. One of the things that I wanted to do is explain how, A, our claim is supported by the text 1962C, which essentially we were employed by or associated with an enterprise to conduct or participate directly or indirectly. This is the text of the enterprise's affairs and through a pattern of racketeering activity, we sufficiently alleged those things for the purposes of a motion to dismiss for sure. And we gave, although the trial court largely ignored it, the trial court basically largely ignored the RICO case statement that we put in that she requested. We went point by point through each of the parties I just identified, which of course, Mr. Phillips and LIC is the third group, Judge Smith, that was involved here. And the unsolicited records that were completely ignored by Judge Lynn, completely, as if they didn't exist, go in detail in terms of Mr. Phillips and LBLIC's involvement. And we went after we received those letters and we went and investigated and found out that there was a deeply intertwined interrelationship between Mr. Jordan and his affiliates and Mr. Phillips. In fact, it is still gone without response that the, quote, JP, end quote, in the JP, multiple entities involved in the Sooner Enterprise, all those SPEs, the P stands for it's gone unresponded, Phillips. Now, where ultimately we end up is that this is the allegations not only are supported and comport with the text of 1962C, but they comport with the congressional intent behind 1962C. Literally, Sedema, 1985 US Supreme Court case, reversed the dismissal of a civil RICO action based on an overbilling scheme that involved inflated charges and non-existent expenses. This is a US Supreme Court. And in that decision, the US Supreme Court noted, one, Congress's express admonition that RICO is to be liberally construed. Two, Congress wanted to reach both, quote, legitimate and illegitimate enterprises. And this is not news. This is not something that's been only going on since 1985. And in 2023, the US Supreme Court, quoting Sedema in its Smajan decision, again, said the same things. And it said that the RICO statute, the civil RICO statute is, quote, notoriously expansive in scope. That's the text. That's the congressional intent. And we're on a motion to dismiss. Now, your honors, I recognize that despite the fact that we're on motions to dismiss and that the trial court did not allow any discovery, immediately stayed discovery, that we have quite a record that was sent up to this court. So what I'd like to do with the remainder of my time, of course, subject to any questions you may have, is I want to give seven key examples of important sets of allegations that were either completely ignored by the trial court or actually drew where she took and drew inferences against my client and in favor of appellees. And as you do that, be sure you tell us how you complied there with Rule 9b. Yes. I think that will become self-evident as I describe that. Let's take the first example. The district court completely ignored the allegations and detailed documents describing certain particular lawsuits and even sworn deposition testimony involving similar victims of the Sooner Enterprise. And these lawsuits alleged fraudulent and even, quote, criminal, end quote, overcharging. In doing so, the trial court not only ignored the allegations, but it ignored the allegations and submissions in the RICO statement she herself requested for us to provide, which has to be considered on the motion to dismiss. And she only referenced the First Amendment complaint in the discussion of other victims. So it's important to note before I get to two of these cases that in the district court opinion by Judge Boyle that was the basis of this court's recent D&T decision, the decision that you were on the panel for, Judge Jones. In that district court opinion, she specifically described by name the lawsuits that were identified by the plaintiff and bit by bit, with specificity, went through them as required by H.J. Inc. and multiple of its progeny. Now, with regard to that point, it's important for me to describe these. I'm only going to take two of the ones that are alleged that she ignored. They're relevant not only because they go to pattern and continuity. They also go to circumstantial evidence of the inference of intent and fraud. We've cited multiple cases in this regard. So let's, with that as a backdrop, take the first case. First case that she completely ignored was National Bankruptcy Services. National Bankruptcy Services was a case where MBS sued one of the JP entities and subpoenaed them sooner. Why? Because it was suing them for overcharges for HVAC, janitorial services, salaries, management fees, lease charges, gross ups of expenses, and inflated shares of lease base. If that sounds familiar, that's because that's what we were suing for. The lawsuit alleged many, I'm quoting, many unlawful accounting practices, ROA 2999 to 2100. The district court ignored altogether those very specific allegations, which by the way, in your opinion in Abrams, Judge Jones, they don't have to have for continuity purposes a heightened standard of pleading. But ignoring that for the moment. Are these cases that you're saying, my opinion, Judge Jones, are they in your brief? Yes. Okay. Well, then you're not, okay. I'll take your word for it. Abrams is cited in the brief. Okay. Yes. Abrams is not the plaintiff because I was looking. No, no, no. I apologize. And my error, if I meant, what I was citing to is the case. The basis for your statement in the case that you don't need that. And Abrams is the case in which you wrote the opinion. Okay. I apologize for that, Your Honor. But the point is the district court completely ignored these well-pled facts to say that we failed to plead any history of a similar fraudulent conduct. You know, I'll give you that point. But the court, what was most telling to me, and I guess your time's about up so you can address it on rebuttal, is the allegation that they didn't really lie about any of this for purposes of wire fraud. In other words, they overcharged you and then each time you got your auditors in there and proved there were overcharges and they kept the money. And so that has, I thought that those are the predicate acts, right, that lead to the RICO charge.  I might as well take it on and you can take it. You can. But I don't want to otherwise rebuttal. The predicate acts do not have to have a falsehood in them themselves. They just need to be in furtherance of the scheme. And that is what happened here. And both in Comstock, this court's decision, as well as in U.S. Food Service, Second Circuit, it made very clear. In both of those cases, there were audits before the RICO claims that survived were affirmed and moved forward in both of those cases. And the reason is because a contract cannot... Thank you, Your Honor. Okay. That is in your brief, I know. Okay. You have a chance for rebuttal. Thank you, Your Honor. All right. Mr. Schorsch? Yes, Your Honor. May I proceed? Yes, sir. Your Honor, I'm only going to touch on a few points. I only have 10 minutes. I'm sharing my time with Mr. Madden. I'm going to start where counsel left off, where he suggested that the Honorable Judge Lynn somehow failed in the depth of her analysis, failed to dig deep enough to determine whether he had a well-pled complaint. Whether he had a well-pled complaint, and whether thereby he also satisfied the pleading requirements for fraud under 9b, which are more stringent. Counsel respectfully glosses over the obligation under 9b when pleading fraud, of which wire and mail fraud is a fraud. A fraud is a fraud is a fraud, and you must plead with greater particularity. Judge Lynn, just like Judge Boyle in her case, which this court most recently ruled on in D&T, both of them went through an exhaustive analysis of enterprise, of continuity, of the fundamental underlying building blocks that would be required. Most telling, when this court was considering D&T, which in all fairness, if one were to take facts and put them on a scale, there were far more unsettling facts in D&T that could have mitigated in an emotional sense, in a real-world sense, for a finding that they met their pleading requirement, for a finding that they might stay in federal court under Civil RICO, as compared to our case. I would say the scale was at about 90 versus about 10, if you compared the facts of those two cases, and yet this court, true to its guidance from the Supreme Court, true to its earlier progeny, said, no, it's not enough. And it focused on 9b, and it focused on the commercial entity, the underlying proper commercial purpose. Let's look at what his case is really about. And there's really only two or three things to focus on. My father told me, and I never really understood this comment, maybe until this morning when I thought about it. He said to me often, stop making everything a federal case. Not everything is a federal case. I didn't know what he meant. He meant a big deal, I thought. Well, it means quite a bit more here. It goes to the jurisdiction. It goes to the constitutional ambit of this court's duty. This is not a constitutional case. This is not a big deal. This is a landlord-tenant dispute arising out of one lease with one tenant at one property in one city with one landlord, one tenant, one management company, and a litany of written terms in a written lease reviewed by a major Dallas law firm over and over and over again as they approved and continued their tenancy in the building. They even continued it from prior owners to current owners. They even liked that building so, so much that they invested in it, as you, Judge Jones, pointed out. Now, in their zeal to throw out a veritable potpourri of damaging facts, to create some continuity, to create some connectivity between these people and these events sufficient to meet the stringent burden of RICO and an enterprise and continuity, they throw in the following statement. We were investors. Except there is not, as you noted, an investor claim in this suit. There is not an investor damage. There is not an investor portion of this suit. They throw it in because there are investor cases out there, even one out of the Honorable Judge Lin's court, the Baymark case, in which she says just barely did they make the pleading standard. They may not make it to Rule 56. They may not make it to a directive verdict, but they just barely make it over that minimum threshold, and they just barely survived 9B with their fraud facts, in part because it was an investor suit. And you can see it in her analysis. This is not an investor suit, and yet they threw that in there. Now, it does have one salient, relevant application to this case. If you'll note in the factual description and the exhibits, including in the RICO case statement, which I might add was given a year almost after it should have been, in Judge Lin's court, it's effectively a standing obligation that when you file a RICO case, you file a RICO case statement, and her clerks just missed it. I'm not telling you, because I went and looked at her website again last night, that it's a standing order for that senior judge. But at one point, it was a standing order for the entire Northern District in Dallas, and then not anymore, but Judge Lin always required it. In your D&T case, you noted in the record, and I believe it was you, Judge Jones, that there was no RICO case statement, which would have allowed the court to evaluate with greater clarity the building blocks, all the atoms that led to the creation of that one being that was that one transaction, or a multitude of transactions. Mr. Koshman, if I understood him correctly, represented that the complaint includes details of similar victims in other transactions. I guess he was using that to show a pattern of racketeering activity. We accept those as true at the pleading stage. Tell us whether or not that's relevant in terms of getting past 9B and Rule 12. I didn't think it was relevant, and Judge Lin didn't think it was relevant, although I think the question is salient, because he brought it up, and it's of a concern to the  The reason I don't think it matters is because Judge Lin did consider it. She gave them an original pleading. She gave them the automatic amended pleading. She realized they hadn't done the RICO case statement, so almost a year into the case, they filed approximately a 75-page RICO case statement. Then they responded to our Rule 12b-6, so they've had four opportunities in great detail with attachments to tell their best story that included this allegation that there were others. Well, there was another building. It wasn't the same building. There was a different lease. We don't know what the terms of it were. There were different tenants. We don't know what their terms were. But in terms of just the common understanding of the term pattern of racketeering activity, that would add substance, would it not, to their complaint? It could if, as Judge Lin and before her Judge Boyle in that other case, as they looked at, did the underlying predicate acts that they're pointing to in that case for purposes of continuity, for purposes of future risk and future victims, did it really reflect that with enough plausible variability that we can look at that and say that's well-plaid and we can accept it as true? Judge Lin thought not. Judge Boyle thought not. This Court thought not on Judge Boyle's case, and I think it should think not again because it did not tie to the same property. It's just another landlord dispute over OPEX. I have disputes with my own landlord over OPEX. That's a lot of money. It's a lot of overcharges. It can be a lot. It's here alleged to be a lot. It is alleged to be a lot. But whether it was a single dollar or a grand huge amount of dollars, it's not here on diversity. It's here on federal question. You know, it's plausible in light of that D&T case which had a similar MO where you buy a building and then somehow your captive insurance company owns it and then you siphon money out of the tenants. It sounds like a risky way to make illicit profits, but it sounds plausible. But whether it involved wire and, you know, the predicate act is another matter. Your Honor, respectfully, I see the analogy at 2,000 feet. When we come down to 100 feet and 50 feet and right on top of it with a microscope, I think it's very dissimilar. I think that in D&T, there was arguably an effort to buy entities that were targeted. If you believe their case, my clients targeted this particular building to get to them because they're the only plaintiff, targeted their lease to get to them through OPEX. How many tenants are there? Oh, my goodness. I think it's a 15 or 20-story building. The tenancy changes over time. I couldn't possibly tell you, but there's a lot of them. It's a commercial multi-story building. They're not the only tenant. They're not even close to the only tenant. And to believe them, they were targeted. To believe them, the underlying acts were specific fraud acts sufficient to meet 9b. Of great importance, since they want to guide you to their belated RICO case statement, Mr. Monk, the managing partner, the driving force of this lawsuit that his own firm had to handle rather than another firm. One might ask why that is so. It's all speculation, but to me, it's a question. He points to the fact that when he was investor, and though he got bought out and has no complaints, he received documents that showed from the investor standpoint, the building would be more profitable by lower OPEX, greater profits. As a tenant, he claimed at the same time he received documents that showed that the OPEX would go down and they would do better. That means that before he signed off on his new lease, I'm done, Your Honor. May I finish my sentence? Yes. Before he signed that new lease, he had written proof of both extents, which means he has no reliance when he goes and signs a written lease as a highly educated lawyer that he now wants to rely on for you. Okay. Thank you. Thank you, Your Honor. All right. Mr. Madden. Thank you, Your Honor. May it please the Court? Two of the parties that I represent are the after added defendants, Brad Phillips and Liberty Bankers Life Insurance Company. The appellant urges you to consider the case management statement, and Judge Smith, I want to do that under the guise of your first question about enterprise and also allegations that arise to the particularity requirements of 9B as it relates to Liberty and Brad Phillips. The context is, they were not parties to the original complaint. The case management statement shows that after the original complaint was filed and before the first motion to dismiss, which raised as its biggest issue, lack of an enterprise between Mark and his employees, magically, Liberty was added to the amended complaint, but it was after the case management statement reflected, they sent my clients a letter saying, we have fully investigated you folks and we don't allege any impropriety. In that context, Judge Lynn found that the mere naked statement that Liberty and Phillips was aware of, participated in, and aided and benefited from, OPEC's expenses at a building in 17, 18, and 19, that they weren't even a lender on until 2020, did not meet the 9B standards and that Liberty and Brad Phillips should be dismissed for RICO claims. If Liberty and Brad Phillips, Justice Smith, are dismissed of their RICO claims, there is no enterprise. It's Jordan et al. Now, with respect, Judge Jones, to the NBS litigation, again, as it relates importantly to Liberty and Brad Phillips, that litigation was what this case should have been filed as, a state court breach of contract claim. There was no allegation of fraud. The allegation was overcharging and breaching the contract. But importantly, Liberty was not a party to that litigation, was not a lender in that building, and was not allegedly involved or knew about or relied upon in any way, shape, or form, that prong of it. Liberty ought not to have been added as a party. When pushed, and I didn't hear any of this in the argument, I heard a lot about NBS, but I didn't hear anything about how is it then that Liberty engaged in a predicate act or was involved in this plan or scheme or benefited from it. It's letters saying in 22, before the lawsuit was filed, where Liberty was trying to facilitate a settlement between its borrower, a landlord in a building, which the asset was the security for the loan with the biggest tenant. There was in excess of 50 tenants throughout this period, Your Honor, additional other than Monk, but that they would have the temerity to try to facilitate a settlement agreement. Now, if this court enters a ruling that that set of circumstances plausibly pleads a RICO claim, imagine the chilling effect on getting any of these business disputes resolved. No lender is ever going to stay away from it from a thousand-foot pole. With respect to the Liberty aspect of this, the court's determination on a motion to dismiss with prejudice was correct and the appellants don't seriously argue otherwise. With my remaining time, I want to go back to the first issue, the primary issue before DT, because again, this court's opinion in DT had not been at the time that the district court spoke on this, Judge Lynn focused on racketeering activity. Again, if you listen, there's four different . . . Mr. Shors pointed out there's a pleading, an amended pleading, a RICO statement, a response to a motion to dismiss and all the exhibits that are attached to those and you have different stories and different arguments at different times. In this court, there are a whole plethora of new cases where they contend that breach of contract without more is enough and those are explicated at page 25-27 of my briefing and in that I articulate each instance in where those cases required more than a simple breach of contract. Here's the three issues that I think they rely upon. They want this court to rule that there was an allegation, a plausible allegation of RICO activity, this court's got to find that they agree with them that at this preliminary stage, their characterization of the exhibits, their audit report, that NBS lawsuit, even though it doesn't say what they say it says, the ones that are attached both to the amended complaint and the RICO case statement, that their characterization controls and raises a fact question. That a mere breach of contract, that is a contractual overcharge, is sufficient misrepresentation to support a claim for mail fraud and in that regard, I'll go back to this, they want to talk about this court's recent opinion in Swenson, was argued in their reply so we didn't brief it, that they say overrules this court's Aruda opinion and its adoption of Zell-Perelman. I don't think it does and then third, in the alternative they say, okay, even if you need them more, that in determining whether there is a fraudulent concealment, which is what they primarily rely upon, that the district court should have ignored their exercise of the audit rights, all of the underlying information, documents, invoices that their auditors were given to review and the lack of their auditor's findings of any of their conclusory fraud allegations and they don't have any. If you look at their reply, they rely . . . of the cases I explicated, twenty-five through twenty-seven, they're down to sandwich chef and Comstock and there is that naked statement in sandwich chef that says, you know, we can rely upon a concealment without an obligation to disclose and a naked for overcharge, but in order to take that and apply it to this case, you have to ignore the fact of what the underlying facts and circumstances were and the overcharge in the invoice determined in that case was, you're billing for unapproved state regulated unapproved fees and services and calling taxes or state charges. That's not what the OPEX reports and the general ledgers that were sent in support of it when they were sent showed. It showed actual checks to actual people for actual work and the audit opinions didn't find otherwise. In Comstock, the Comstock opinion relied upon, well importantly, in that case they considered the fact that an audit was a part of the procedure in determining whether RICO occurred. In that case in Comstock, what the defendant did was when the city went to exercise their audit rights, they had their folks manufacture artificially time records. That's what the evidence showed. That's what the allegations were. There's none of that here. None of that. I'll give you for instance, Judge Jones, you said this is a big charge. Half of the charge that we're talking about of overcharges is management fees in the first two years. There were two auditors. The first auditor said, well, I think the management fee shouldn't be 5%, it should be 3.25%. The next auditor comes back and says, well, we've looked at the fact that their first auditor was their broker, which wasn't independent of the lease, and that's why they got a new auditor for 19. The new auditor came in and said, okay, well, I've looked at it. I'm going to punt it and I'm going to say, I'm going to fix it at 4% because that's what the DECI charged him for 20 years before Banner took over. Now, that's a delta of hundreds of thousands of dollars. Of course, the deal is if you're running it so that you're friends with ones, you're basically laundering the money, excessive charges to your friends and they're not doing anything. Judge, I could speculate about that, but there's no specific allegation that any of this money was upstream to Liberty or Brad Phillips in this allegation. The only allegation is the conclusory allegation that we have knowledge of and benefited from it. That's just the statement, a conclusory statement of an element of the claim. There's no plausible, factual scenario or recitation anywhere in this pleading, anywhere in the RICO case management statement or anywhere in the attachments that this court should read and review the context of over the out conclusory allegations that would establish that other than the letter in August of 2020 before they sued Liberty and Mr. Phillips saying, we've looked at it and you've done nothing wrong. Thank you, Your Honor. All right. Thank you. Okay, Mr. Cushman. Rebuttals. Your Honors, I want to quickly make some points. In reply, I'm not going to re-go over what I've said before. One, D&T concluded there's no continuity or threat of continuing activity. Here, we have both. In fact, they admit that after this dispute arose, they completely stopped sending us OPEX reports. There is no greater evidence of intent or contribution or continuity of the scheme, stronger than the fact that they completely stopped providing us any information regarding what they were doing anymore after the dispute arose. You still have audit rights though, don't you? We have audit rights, which would be a little bit difficult without having any of your OPEX reports, but the point is that audit rights, much less any contractual rights, do not vitiate fraud. They don't vitiate theft. A contract can't do that. In both U.S. Food Service and in Comstock, they had an audit before they brought. That's how you figure out what's happening in the scheme. That is the very essence of what's happening here. Of course, we have to do that, or we're going to have to sue them for an accounting, but that doesn't vitiate theft. That's just part of the process, and by the way, again, U.S. Food Service, Comstock, both had audit in them, and the case I was referencing, National Bankruptcy Services, had an audit before they discovered all those fake charges. The second point is, she erred by having a heightened or strong inference pleading standard. It is plausibility. It is plausibility under Afshani, Bollinger, IAS, all this court's decisions, and of all, strong inference comes from the PLSRA securities cases, and by the way, under the PLSRA, there is a specific section that deals with scienter that requires a strong inference. That's not in the RICO statute. Moving on to the fact that we didn't get to go to the next case that was completely ignored by the district court, Ray Closing, it's all over our RICO case statement, and it's something that is attached with sworn deposition testimony. Excuse me, Your Honor. In the, excuse me, in Ray Closing, you literally had allegations of crimes. You had the CEO, Scott Everett, testifying that the conduct involved fraudulent behavior, and he agreed in emails that are part of this record that Jordan and Sooner's financials were, quote, criminal, end quote. Sarah Alford Norris, prior business partner of Mr. Jordan, swore under oath in that case, and it's part of the record, that Sooner overcharged for management salaries, that it duplicated pass-through expenses, it inflated pass-through expenses, and she swore under oath and called it, quote, seriously criminal. This was ignored. The attachments were ignored, and as this court, I'm sure, is well aware, a RICO statement, you don't force a plaintiff to spend the scores of hours to prepare something like that without having to consider it as part of motions to dismiss. The Beta case, multiple Northern District cases have held that. That's why you, if it's requested, that's why you file it. Consider it. This is a motion to dismiss. It's not a motion for summary judgment. It is not trial. Your Honors, you don't need reliance. Judge Smith, you held that in Planbeck. Of course, it's not part of the statute. Judge Smith, you held that in Torres, and this court held it in St. Germain. You don't need reliance in this, in the Fifth Circuit, much less in many, many other circuits. I'd like to end by . . . Make it quick. Yes, Your Honor. I'd like to end by saying, this case is no ordinary garden variety breach of contract case. I urge this court to take a look at Sedema, Sandwich Chef, which Judge Smith, you called it classic fraud, inflated charges as being classic fraud. Comstock, Comm Metal's Northern District case, Cypress, Northern District case, then other circuits. That's enough. Thank you, Your Honors. I appreciate the attention.